UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

GUSTAVO CONTRERAS,

                Plaintiff,

v.

RENEE BAKER,

                Defendant.

Case No. 3:14-cv-00435-LRH-WGC

ORDER

Before the court for a decision on the merits is a petition for a writ of habeas corpus filed by Gustavo Contreras. ECF Nos. 3/36. For reasons that follow, the petition will be denied.

I. BACKGROUND[1]

On May 20, 2011, after a jury trial in the state district court for Clark County, Nevada, Contreras was convicted of battery by a prisoner and sentenced under the small habitual criminal statute to 60 to 150 months in the Nevada Department of Corrections (NDOC). The State presented evidence at trial that, on September 19, 2010, Contreras, at the time an inmate at Clark County Detention Center (CCDC), "sucker punched" another inmate, Christian Contreras,[2] then sliced his head with a knife

---

[1] Most of the information in this section is derived from the state court record located at ECF Nos. 11-14, 38, and 47.

[2] To avoid confusion with the petitioner, Christian Contreras is hereinafter referred to as "Christian C."

or blade. The State also presented evidence that a third inmate, Matthew Romero, intervened in an effort to stop the altercation.

On September 12, 2012, the Nevada Supreme Court affirmed Contreras's conviction and sentence. On April 12, 2013, Contreras filed a state post-conviction petition for a writ of habeas corpus. That petition was denied on June 26, 2013. Contreras appealed. The Nevada Supreme Court affirmed.

Contreras initiated this proceeding by mailing his federal habeas petition on August 5, 2014. His petition contains ten separate grounds for habeas relief, all alleging ineffective assistance of counsel in his state criminal proceeding. On October 29, 2015, this court granted Contreras's request to stay these proceeding to allow him to exhaust state court remedies with respect to three claims – Grounds 8, 9, and 10.

Representing that he had concluded state court proceedings, Contreras filed, on April 3, 2017, a motion to reopen federal habeas proceedings. This court granted the motion. Thereafter, respondents filed a motion to dismiss certain claims in Contreras's petition, arguing that they are procedurally defaulted. In addition, Contreras filed a motion for leave to file a supplement to his petition. In ruling on those motions, the court dismissed Grounds 6 and 7 at petitioner's request, dismissed Grounds 8, 9, and 10 as procedurally defaulted, and permitted petitioner to supplement Grounds 1 and 2.

Grounds 1 through 5 are now before the court for a decision on the merits.

II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which imposes the following standard of review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

3

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014); *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

Because *de novo* review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

III. DISCUSSION

All the remaining claims in Contreras's petition are premised on allegations that he was deprived of his constitutional right to effective assistance of counsel. To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show 1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) that it is reasonably probable that, but for counsel's errors or omissions, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).

*Ground One*

In Ground One, Contreras alleges he was deprived of effective assistance of counsel because his trial counsel, Carl E. Arnold, failed to conduct an adequate investigation. According to Contreras, there were several witnesses who saw the entire altercation between him and Christian C. and would have testified that Contreras acted in self-defense. The evidence proffered to support this ground consists of three

declarations from inmates who claim to have witnessed at least a portion of the fight –
Steven D. Sutton, George Steele, and Jason Scott Spencer. ECF No. 36, p. 5.

The state district ruled as follows in addressing Contreras's claim that counsel's investigation was inadequate:

> In this case, Defendant Contreras provided the affidavits of two persons, Steven D. Sutton and George Steele, who claim to have witnessed the altercation in question, however, neither exculpate him. Mr. Sutton attests he witnessed two "Southern Gang" members attacking his neighbor, who, interestingly enough, he did not know was Mr. Contreras at the time. Whether such a statement is true, such does not exonerate Defendant from using a sharp object to slice the head of Christian Contreras, who, from all accounts, is not a gang member. Mr. Steele claims he witnessed Hispanics "jumping Inmate Gustavo Contreras Estrada." He also notes Defendant "did nothen (sic) wrong he was just doing his time I've talked with him he's a cool person. . . ." Again, such statements do not exculpate Defendant. In light of the testimony of both corrections officers and inmates presented at trial, it is difficult to perceive how further investigation of these witnesses would have altered the outcome of the case.
>
> Defendant also proposes…his attorney "failed to attempt to locate" any favorable witnesses among the 98 inmates "filter[ing] through during the fight." Such allegations, at best, are bare, and demonstrate a speculation Mr. Arnold might have found favorable witnesses if he had interviewed the 98 inmates. Succinctly put; Defendant Contreras fail [sic] to show evidence any of these inmates *would have* provided favorable testimony or there was a reasonable probability such would have changed the case's outcome.

ECF No. 14 at 10–11 (emphasis in original).

Citing *Strickland*, the Nevada Supreme Court addressed the claim in the following manner:

> [A]ppellant claimed that his trial counsel was ineffective for failing to investigate witnesses. In support of this claim, appellant included affidavits from two fellow inmates who asserted that they witnessed the altercation. Appellant failed to demonstrate that his trial counsel's performance was deficient. Appellant did not claim that counsel knew of these two potential witnesses prior to trial, but rather merely asserted that counsel could have interviewed the numerous inmates who potentially could have witnessed the incident. Under the circumstance of this case, appellant failed to demonstrate that such an exhaustive interviewing process that was without further guidance from appellant regarding specific potential witnesses would have been undertaken by objectively reasonably diligent counsel. *See Strickland*, 466 U.S. at 691 (stating "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances").

5

> Appellant also failed to demonstrate that he was prejudiced by the failure to discover these potential witnesses as their purported testimony was similar to the testimony already presented to the jury in appellant's defense, that appellant did not initiate the attack on the victim. The jury already rejected this defense at trial. Appellant failed to demonstrate a reasonable probability of a different outcome at trial had further testimony of a similar nature been discovered by counsel and presented at trial, particularly in light of the detention center employees' testimony that appellant attempted to distance himself from the injured party and blend in with the rest of the inmates when the employees arrived upon the incident scene. Therefore, the district court did not err in denying this claim.

ECF No. 14-8 at 3–4.

This court questions the Nevada Supreme Court's conclusion that counsel did not have an obligation to investigate possible eyewitnesses to the altercation absent some guidance from his client. A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 691.

In addition, this court also disagrees with the state supreme court's reasoning as to lack of prejudice – in particular, its disregard for the impact additional corroborating testimony might have had in showing that Contreras was not the initial aggressor. "[T]he testimony already presented to the jury in appellant's defense" to which the Nevada Supreme Court referred consisted of testimony from two witnesses (Romero and Contreras) that the jury had ample reason to doubt. Romero's testimony that Christian C. was the initial aggressor (ECF No. 47; p. 21, 23, 39, 58) and that Contreras did not have a blade or knife (*Id.*; p. 28, 49, 91) was contrary to his statements to corrections officers immediately after the fight (*Id.*; p. 106, 125). And Contreras had an obvious self-interest in claiming that he was not the initial aggressor. Given the dubious nature of this testimony, the Nevada Supreme Court was not justified in dismissing proffered corroborating testimony from other sources on the ground that it was duplicative or cumulative. *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) (attorney's failure to pursue corroborating evidence in support of defense may amount to constitutionally deficient performance).

Even reviewed *de novo*, however, the claim lacks merit because the proffered declarations fail to establish a reasonable probability that the testimony of the declarants would have caused the jury to return a more favorable verdict.

With respect to the declarations from Sutton and Steele, neither describes with any specificity how the fight began nor, for that matter, indicates that the declarant even saw how it began. The relevant portion of Sutton's brief declaration states as follows:

> *While* an altercation was taken [sic] place in 7-B North Tower I witnessed two (2) Southerner Gang members attacking my neighbor who I didn't know at the time, because of my personal reasons.

ECF No. 13-23, p. 38 (emphasis added).

In his declaration, Steele stated:

> I was in 7B cell 1 It was breakfast time I witness [two] Hispanics jumping inmate Gustavo Contreras Estrada # 10606517 from what I could see there [were] really trying to hurt him I think it was because the 2 Hispanics [were] gang member[s] from the south side gang

*Id.*, p. 40 (missing punctuation in original).

Spencer's description of the fight in his declaration is moderately more detailed but is suspect in that it was composed three years after the event and, in at least one significant respect, differs from the account provided by Contreras and Romero at trial.

Contreras testified that the altercation began with Christian C. taking a swing at him, in response to which, he threw a single punch that knocked Christian C. back off his feet. ECF No. 47; p. 207-09, 213; ECF No. 11-21, p. 25-27. At that point, Romero shoved Contreras into a corner and started taking swings at him. *Id.* Then Romero pinned Contreras against a wall while Christian C., who had regained his footing, began hitting Contreras until corrections officers broke up the fight. *Id.* Contreras further testified that he did not get another shot at hitting Christian C. after the initial blow. ECF No. 11-12, p. 27. Though he claimed he was attempting to break up the fight rather than participate in it, Romero gave a somewhat consistent account in his testimony and, notably, did not mention Contreras striking Christian C. at any point after the initial blow at the outset of the altercation. ECF No. 47, p. 21, 23, 41-43, 49, 58.

7

In his declaration, Spencer stated that when he emerged from his cell on the morning of September 19, 2010, he observed Christian C. and Matthew Romero attacking petitioner Contreras. ECF No. 18, p. 6. Contrary to Contreras and Romero's accounts, Spencer's declaration states that Contreras's punch knocking Christian C. to the floor came *after* Contreras fended off being attacked by both Christian C. *and* Romero. And, like the other two declarations, Spencer's declaration is also ambiguous as to whether he saw how the fight began.

In summary, the declarations Contreras relies upon to show prejudice do not demonstrate that the declarants, if called to testify at trial, "would have altered significantly the evidentiary posture of the case." *See Rios v. Rocha*, 299 F.3d 796, 813 (9th Cir. 2002) (quoting *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998)). Thus, he has not established that their testimony would create a reasonable probability that the jury would have entertained a reasonable doubt concerning guilt.

Ground One is denied.

*Ground Two*

In Ground Two, Contreras alleges he was deprived of effective assistance of counsel because counsel failed to prevent the State from using perjured testimony to obtain his conviction. The testimony Contreras claims was false consisted of testimony that Christian C. was not affiliated with the Sureno gang and that he (Contreras) was the initial aggressor. With respect to the former, Contreras alleges the prosecution knew that Christian C. was affiliated with the Surenos because another inmate, Alexander Perez, had told a police detective, Gabriel Munoz, that the fight involving Christian C. and Contreras "was just a little problem with us" and that "us" referred to the Sureno gang. ECF No. 13-2, p. 59.

This claim lacks merit. Defense counsel elicited testimony from Romero that he believed Christian C. was a gang member. ECF No. 47, p. 35. Then, when Christian C. testified, counsel effectively cross-examined him on this point. *Id.*, p. 76-79. Counsel also cross-examined Detective Munoz at length about gang activity, including the

above-noted statements by Alexander Perez and Christian C.'s possible gang affiliation. *Id.*, p. 154-179.

In his closing argument, defense counsel asserted:

> What I've been saying all along, [Christian C.] went to attack Gustavo Contreras. That was the guy that was trying to get his stripes. Why do you think the shot caller was down there running back and forth beforehand? It was Christian Contreras who was trying to make his stripes. He didn't want to be the pusher paper [sic] anymore, you know, collecting the paper, seeing who was charged with what, which Hispanic was part of the Nortenos or the Surenos or the . . . Border Brothers, you know. He wanted to move up in ranks and so he went and he did this hit against my client.

ECF No. 11-21, p. 40-41.

Contreras does not specify what additional steps defense counsel could have taken to refute evidence that Christian C. was not affiliated with a gang. He fails to show that effective counsel could have done more to show that Christian C. or any other witness committed perjury. Accordingly, he has not established the counsel's performance fell below an objective standard of reasonableness in this regard.

As for the remaining portion of Ground Two, the Nevada Supreme Court held:

> Appellant also claimed that counsel should have asserted that the State's witnesses who testified that appellant was the initial aggressor committed perjury. Appellant failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. Counsel cross-examined the officer and the State's witnesses regarding their version of events and appellant failed to demonstrate objectively reasonable counsel would have argued that their testimony amounted to perjury. Appellant failed to demonstrate a reasonable probability of a different outcome at trial had counsel argued the State's witnesses committed perjury.

ECF No. 14-8, p. 5.

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The Nevada Supreme Court applied the correct federal law standard – i.e., *Strickland*. ECF No. 14-8, p. 2-3. The record demonstrates that counsel made reasonable efforts to refute testimony that Contreras was the initial aggressor. He elicited testimony from Romero that a corrections officer attempted to get him (Romero) to say that Contreras was the aggressor, but Romero told him it was "the guy who was cut" – i.e., Christian C. ECF No. 47, p. 58. Then he effectively cross-examined Christian C.'s testimony that it was Contreras who hit him. *Id.*, p. 86-87. Contreras testified in his defense that the fight started with Christian C. taking a swing at him. *Id.*, p. 207. In his closing statement, counsel made a cogent argument that Christian C. was the aggressor. ECF No. 11-21, p. 40-41.

The Nevada Supreme Court's decision that Contreras failed to meet either prong of the *Strickland* standard was reasonable. At a minimum, fairminded jurists could disagree on the correctness of the decision. Thus, Ground Two must be denied.

*Ground Three*

In Ground Three, Contreras alleges he was deprived of effective assistance of counsel because counsel failed to effectively litigate the State's failure to produce or preserve security video evidence. According to Contreras, effective counsel would have argued that the State's destruction of security video evidence "violated protocol at Clark County Detention Center" and Contreras's "right to a fair trial under the U.S. Constitution." ECF No. 3, p. 7.

At trial, defense counsel cross-examined Alan Hirjack, a corrections officer, about the existence of security cameras in the module where the altercation took place. ECF No. 47, p. 117. Hirjack testified that there were cameras running in the module and that the specific area in question "should have been in maybe one the cameras [sic] view." *Id.* He also testified, however, that he "did not get to review videotapes at all." *Id.*

Patrick Wahlquist, a corrections sergeant, testified that he and other staff viewed the video and that "due to the camera angle" they "couldn't see anything." *Id.*, p. 125-26.

On cross-examination, Wahlquist testified that he did not know where the video recording was located, but that he "may have a copy of it." *Id.*, p. 128.

At the conclusion of Wahlquist's testimony and outside the presence of the jury, defense counsel asked that his testimony be excluded or that counsel be allowed to review the video before Wahlquist be excused as a witness. *Id.*, p. 134. Then, the following exchange occurred:

> [PROSECUTOR]: . . . Judge, I may have misspoken to Mr. Arnold. Mr. Arnold and I have so many cases together, but I just spoke with Sergeant Wahlquist. He's going to come back up and he's going to testify to the following: He did not make a CD of this, they no longer have the video. Once he viewed it and saw there was nothing on it, they had no other preservation of it. So there is no video that exists. As such, there is nothing for the State to turn over.
>
> MR. ARNOLD: Oh, I just wanted to make sure that further representation was made by the State that we did ask for a video or ask if one existed, that it be turned over in this case.
>
> [PROSECUTOR]: In this case, and little fuzzy, it's coming back, in this case we just do not have it. But, yes, Mr. Arnold did ask me for it.
>
> THE COURT: Okay. But after it had been destroyed or after –
>
> [PROSECUTOR]: Yes, Your Honor.
>
> MR. ARNOLD: So we were always under the impression until this testimony that the video didn't exist. But now with these representations I would ask that Mr. Wahlquist come on the stand, make those statements, and so we'd have a record in regards to that, Your Honor.
>
> THE COURT: Because I think the jury's going to wonder about the video.
>
> [PROSECUTOR]: Well, and that's why he testified as to what he watched on but –
>
> THE COURT: Okay.
>
> [PROSECUTOR]: - but that's completely fine with us. And we'll have him come in, and that's all we're going to ask him, nothing new.

*Id.*, p. 134-35.

When Wahlquist was recalled as a witness, he testified in the presence of the jury that he viewed the video and did not see anything relevant on it. *Id.*, p. 140. Consequently, he did not keep it or make a copy. *Id.* On cross-examination, he testified

11

that he reviewed five minutes of the video before and after the fight, but that the fight was not within the view of the camera. *Id.*, p. 140-42.

In his closing argument, Arnold mentioned the State's failure to produce the video recording:

> Listen, this was a fight, a ten, fifteen second fight, it should have been on videotape but that videotape is gone.

ECF No. 11-21, p. 40.

> They threw away the video, a video that was pointed directly down on the stairs where everybody testified this whole thing started. How do you just throw away the video? Well it didn't show anything. Well, we didn't get to see it to make that determination if it showed anything.

*Id.*, p. 42.

On direct appeal, Contreras argued that the State's failure to preserve the video recording warranted the reversal of his conviction. ECF No. 13-6. The Nevada Supreme Court rejected the claim as follows:

> Appellant Gustavo Contreras contends that his conviction must be reversed because the State failed to preserve a video recording that was "most likely" exculpatory and material to his defense. "The State's loss or destruction of evidence constitutes a due process violation only if the defendant shows either that the State acted in bad faith or that the defendant suffered undue prejudice and the exculpatory value of the evidence was apparent before it was lost or destroyed." *Leonard v. State*, 117 Nev. 53, 68, 17 P.3d 397, 407 (2001). During the trial, Corrections Sergeant Patrick Wahlquist testified that he reviewed the video recording from the security camera in the module where the incident occurred. Although the recording depicted Contreras walking in a certain direction, it did not depict the incident. Wahlquist determined that the recording was not relevant to the case and did not make a copy of it. Nothing in the record contradicts this testimony. We conclude that Contreras has not shown that the State acted in bad faith or that the video had exculpatory value, and, therefore, Contreras has not demonstrated a due process violation.

ECF No. 13-14, p. 2–3.

In addressing Contreras's ineffective assistance of counsel claim, the state district court decided as follows:

> Defendant Contreras also proposes Mr. Arnold was ineffective as he failed to obtain the allegedly exculpatory video recording. Notwithstanding this issue has already been addressed by the Nevada

12

> Supreme Court as indicated above, this Court notes Defendant has never shown the recording actually was "exculpatory." As noted by the high court, Corrections Officer Wahlquist testified at trial he viewed the video and it showed Defendant Contreras walking in a certain direction. That is, it did not show the incident in question, and for that reason, the corrections officer did not deem the recording to be relevant. Even if Mr. Arnold should have made efforts to obtain the video recording in question, Defendant Contreras has failed to show a reasonable probability the trial's outcome would have been different or that he suffered unfair prejudice by his attorney's "lack of effort."

ECF No. 14, p. 11.

Then, on appeal, the Nevada Supreme Court held:

> [A]ppellant claimed that his trial counsel was ineffective as counsel should have raised more arguments to show that a surveillance video which the state failed to preserve for trial was actually exculpatory or was intentionally destroyed. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Counsel argued that the video was exculpatory and should have been preserved. Appellant failed to demonstrate prejudice related to this claim as this court determined on direct appeal that the State did not act in bad faith with respect to preservation of the video and that the video did not have exculpatory value. *Contreras v. State*, Docket No. 68644 (Oder of Affirmance, September 12, 2012). Therefore, the district court did not err in denying this claim.

ECF No. 14-8, p. 4.

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Contreras has not refuted the Nevada Supreme Court's findings that he failed to show that the video recording was exculpatory or that it was destroyed in bad faith. *See California v. Trombetta*, 467 U.S. 479, 489 (1984) (duty to preserve evidence is limited to evidence that possesses exculpatory value that was apparent before it was destroyed); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Contreras

misrepresents Wahlquist's testimony in claiming that Wahlquist testified that he "destroyed the video tape." ECF No. 54, p. 23. At no point in his testimony did Wahlquist state that he destroyed a videotape or, for that matter, that a videotape even existed. Instead, he testified that he reviewed a video (which in all likelihood was an electronic recording) and that, because it did not "show anything," there was "no point for [him] to keep it." ECF No. 47, p. 140. While the distinction between "destroy" and "failure to preserve" may not matter for the purposes of *Trombetta/Youngblood*, the fact remains that there has been no showing that the evidence in question was exculpatory or that the police acted in bad faith. Accordingly, Contreras has not established a reasonable probability that counsel could have successfully argued that Contreras was deprived of a fair trial due to the State's failure to preserve evidence.

Ground Three is denied.

*Ground Four*

In Ground Four, Contreras alleges he was deprived of effective assistance of counsel because counsel failed to contend that Wahlquist committed perjury when he testified that the fight between him and Christian C. was not captured on security video.

The relevant portions of Wahlquist's testimony are described and cited above. In addressing this issue, the Nevada Supreme Court held:

> [A]ppellant claimed that his trial counsel was ineffective for failing to argue that an officer committed perjury for testifying that the surveillance video did not depict the fight….Appellant failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. Counsel cross-examined the officer and the State's witnesses regarding their version of events and appellant failed to demonstrate objectively reasonable counsel would have argued that their testimony amounted to perjury. Appellant failed to demonstrate a reasonable probability of a different outcome at trial had counsel argued the State's witnesses committed perjury.

ECF No. 14-8, p. 5.

Contreras has not presented any evidence, nor is there any evidence in the record, that Wahlquist committed perjury when he testified that the video he reviewed

14

1  did not show the fight.[3] Thus, the Nevada Supreme Court's decision withstands scrutiny
2  under § 2254(d).

  Ground Four is denied.

  *Ground Five*

  In Ground Five, Contreras alleges he was deprived of effective assistance of counsel because counsel failed to retain any experts who could have provided an explanation as to how the victim may have incurred his head wound. According to Contreras, expert testimony would have resulted an acquittal "on all charges, because the injury was not cause[d] by the alleged 'weapon' that the alleged victim added to his fabricated story." ECF No. 3, p. 11.

  In addressing this issue, the Nevada Supreme Court decided as follows:

  > [A]ppellant claimed that his trial counsel was ineffective for failing to retain an expert to review the crime scene or discuss how the victim obtained the wound to his head. Appellant failed to demonstrate deficiency or prejudice for this claim as he failed to show that expert witness testimony of this type would have been helpful to his defense. In addition, the State's witnesses discussed the crime scene and the victim's head wound and appellant failed to demonstrate that a defense expert witness would have testified in a different manner. Therefore, the district court did not err in denying this claim.

  ECF No. 14-8, p. 5.

  Here again, this court must defer to the state court's decision. Contreras does not identify an expert who would have been able and willing to testify in favor of the defense. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (noting that speculation that an expert would have testified on the defendant's behalf is not enough to establish prejudice under *Strickland*). In addition, counsel effectively opposed the State's theory that Contreras cut Christian C. with a sharp weapon. Counsel elicited favorable admissions from the State's witnesses on cross-examination. ECF No.47, p. 37, 111, 130-31, 161. Also, counsel pointed out in closing argument that nobody testified to actually seeing a weapon and that the State had not presented any expert

---

[3] In his reply, Contreras notes Wahlquist's conflicting testimony about whether he kept a copy of the video – stating first that he "may have a copy" then shortly thereafter stating that he did not. ECF No. 54, p. 27-28. This is a different issue, however, than whether the video captured the fight.

15

testimony establishing that Christian C.'s cut was caused by a blade rather than hitting his head on stairs. ECF No. 11-21; p. 36, 42. Ultimately, the jury returned a verdict of guilty of battery by prisoner *without* use of a deadly weapon, rather than with a deadly weapon. ECF No. 11-24. Thus, Contreras has not satisfied either prong of the *Strickland* standard.

Ground Five is denied.

IV. CONCLUSION

For the reasons set forth above, Contreras's petition for habeas relief will be denied.

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Contreras's petition, the court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Contreras's habeas claims.

IT IS THEREFORE ORDERED that petitioner's petition for writ of habeas corpus (ECF Nos. 3/36) is DENIED. The Clerk shall enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is denied.

DATED this 13th day of November, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE